**FLYNN ex rel. YOUNG QUONG ON v. TIL-LINGHAST, Commissioner of Immigration.**

**No. 2760.**

Circuit Court of Appeals, First Circuit.

Feb. 18, 1933.

MORTON, Circuit Judge, dissenting.

Everett Flint Damon, of Boston, Mass. (A. Warner Parker, of Washington, D. C., on the brief), for appellant.

John W. Schenck, Asst. U. S. Atty., of Boston, Mass. (Frederick H. Tarr, U. S. Atty., of Boston, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

■ The issue in this class of cases where admission is denied is (1) whether the applicant was given a fair hearing, that is, was permitted to introduce all the evidence he desired and have it made a part of the record of the administrative board before which his case was heard; (2) whether there was an entire lack of convincing evidence, or any substantial evidence contra, on which

the conclusion of the immigration officials could rest.

■ The burden of proving his right to enter the country as a citizen is on the applicant. This burden involves satisfying the immigration officials, who have the sole power to determine the credibility of witnesses, and the weight of the evidence as to the facts entitling the applicant to enter as a citizen. The conclusion of a Special Inquiry Board may rest, therefore, on a lack of evidence of sufficient weight in the minds of the members to carry conviction.

Bearing in mind that they have the power to determine the credibility of witnesses, and whether the evidence has sufficient weight to sustain the burden on the applicant, to reverse a decision of the immigration officials refusing admission to an applicant, and of the District Court in denying a petition for habeas corpus, this court must find that the evidence in favor of the applicant is so clear and convincing that the immigration officials must have acted arbitrarily in rejecting the evidence in favor of the applicant because in their opinion the witnesses for the applicant were unworthy of belief, or in finding that all the evidence in applicant's favor did not satisfy the members of the board that the applicant was a citizen of this country.

It is often difficult to determine, not only what evidence the immigration officials rejected as unworthy of belief and on what ground, but also what weight they attached to the evidence in favor of or against the applicant.

The question is not what this court would have found on the evidence that appears in the printed record. The Supreme Court said, in Chin Yow v. United States, 208 U. S. 8, at page 13, 28 S. Ct. 201, 203, 52 L. Ed. 369: "But, unless and until it is proved to the satisfaction of the judge that a hearing properly so called was denied, the merits of the case are not open, and, we may add, the denial of a hearing cannot be established by proving that the decision was wrong." U. S. ex rel. Vajtauer v. Commissioner of Immigration, 273 U. S. 103, 106, 47 S. Ct. 302, 71 L. Ed. 560; Tisi v. Tod, 264 U. S. 131, 133, 44 S. Ct. 260, 68 L. Ed. 590.

The conduct of the hearing and the conclusion of the immigration officials must be so clearly arbitrary and unfair as to amount to a denial of due process. Tang Tun v. Edsell, 223 U. S. 673, 681, 32 S. Ct. 359, 56 L. Ed. 606.

Upon the evidence as it appears in the printed case, a court exercising judicial power might have decided that the applicant was a son of a citizen of this country. Six different witnesses stated that the alleged father, Quong Yuen, alias Young Quong Yuen, had a son, by name Quong On, or referred to him by that name, three of whom were not related, but were testifying in support of the applicant on the other occasions, when he was deported. A brother of the alleged father and one son also testified, in other proceedings, that Quong Yuen had a son, by name Quong On.

The alleged father and a younger brother of the applicant stated that there was a picture of the alleged father and the applicant framed and hanging on the walls of the home in China, which the applicant at first denied and said he was never photographed with any other member of his family. After the evidence was closed, the immigration board opened the case to permit the offering of the photograph, which the alleged father claimed to have had forwarded from China. The picture was identified by the applicant and the younger brother as that of the alleged father and the applicant. The father said the photograph was taken at Hong Kong in 1911, or just before the first application for admission by this applicant, though it does not appear to have been produced in support of that application. While the applicant on his first examination in this case insisted that there was no such photograph, when it was produced he remembered with considerable detail that it was taken sixth month S. H. 3, or just before he sailed for Vancouver in 1911. He recalled how he and his alleged father went to Hong Kong, and where they stayed; that he had his passport photograph taken at the same time; that their costumes were furnished by the photographer, whose name he remembered, and also the route by which they returned home. Such plethora of detail of an event of which he remembered nothing a short time before may have raised a suspicion in the minds of the immigration officials that whoever wrote him that his case was to be reopened may have given him more information.

If the immigration officials believed all these witnesses and there was no discrediting evidence, they could have found that the applicant was the son of an American citizen; the citizenship of Quong Yuen being admitted.

■ Upon what grounds then, may the Board of Inquiry have denied the applicant's right to enter? In the first place, this was the

applicant's third application, he having been twice rejected before, first in 1911 and again in 1923. On his previous applications, the alleged father and the applicant gave their names as Quong Yuen and Quong On. They now claim the family name is Young. An alleged uncle of the applicant and all the uncle's family go by the family name of Quong. Standing alone, a Chinese name would have little significance, though the family name is considered of great importance in China, as the deceased members of the family are objects of reverent worship. No adequate explanation of this change of name was made.

The applicant testified that he worked on his father's farm, which consisted of five ows of land in one parcel, and was working on it during one of his father's visits to China. The alleged father testified that he had no single parcel as large as five ows, but his farming land consisted of several smaller parcels, and that at none of his visits did the applicant work on the land farming. The applicant, after his denial of admission in 1923, lived in what is called the Straits Settlement. The alleged father says he wrote to him while there at least two letters each year, and received at least one letter each year from the applicant. The applicant testified he neither wrote his father during that time nor received any letters from him. These discrepancies by themselves, however, we deem of minor importance.

But the immigration board may have properly attached considerable weight to the evidence of the applicant, the alleged father, and the alleged uncle and his family as to the date and place of the death of the paternal father and mother of the alleged father. Ancestor worship is a well-known and deep-rooted custom in China, and the younger generations hold in reverence their forbears, especially after their decease. One would have a right, therefore, to expect some degree of accord in the family testimony as to the date and place of death of the parents and grandparents, and their place of burial.

Here, however, appears a striking inconsistency which may have resulted in the immigration officials giving little, if any, credence to the evidence of many of the witnesses, as their testimony cannot be harmonized.

The applicant states that he saw both his paternal grandfather and grandmother; that they lived in a house in the sixth row in the village, which now, if not during their lifetime, belongs to his alleged father; that his grandfather died first and his grandmother about a year before his application in 1911.

At the time of his application in 1911, when 18 or 19 years old, the applicant testified that his grandfather was then living and his grandmother was dead; he now says they both died about twenty years ago, and the grandfather died first; that they were both buried in Gong Bing How, with a stone at each grave; that his grandmother's stone is marked Hor She though both he and his alleged father have previously testified that her name was Look She.

The applicant at the first hearing said both grandparents died in the house in the sixth row in Ng Young Village. On his second application, he said they died in the house in the seventh row where his parents resided, but now says the grandparents died in the house in the sixth row.

The alleged father, however, says his mother, the grandmother of the applicant, died before the applicant was born; that his father died about 1900, in the house in the sixth row and not in the seventh, as the applicant has stated. Both agree that the paternal grandfather and grandmother of the applicant were buried in Gong Bing How.

The blood brother of the alleged father and all his family have testified on other occasions that the parents of the alleged father and the alleged uncle died in Kim Goo Village, and were buried in War Long How, and their graves were not marked.

The applicant says the name of his grandfather was Young Yoke Toy and his grandmother's name was Hor She; the alleged uncle's family say the grandfather's name was Quong Young Wah or Wai, and the grandmother's name was Look She.

Certainly a blood brother of the alleged father and the brother's children should know the names of the paternal ancestors, where and when they died, and where they were buried, and how their graves were marked, equally as well as the applicant and his alleged father. Both cannot be right. The immigration officials must have been obliged to reject one or the other as unworthy of belief.

If the applicant's grandmother died before he was born, he could not have seen her. His testimony and that of the alleged father as to the time of her death cannot be reconciled. Bearing in mind that in 1911 the applicant was 18 years old when he testified as to their death but a short time previous, while the father says his mother died

before 1894 and the father about 1900, the immigration officials cannot be said to have been arbitrary in also rejecting one or the other of these witnesses as unworthy of belief. The applicant was testifying in 1911 as to what he said were recent occurrences. The father said they had occurred from ten to twenty years before.

It is quite evident that the immigration officials could not have given credence to both the testimony of the uncle's family and that of the alleged father and the applicant; and that there were such discrepancies in the testimony of the alleged father and this applicant that also warranted the rejection of the testimony of one or the other. Granted the power to determine which, if any, of these witnesses the immigration officials did believe, we do not think it can be said they acted arbitrarily in concluding finally that the evidence did not satisfy them that the applicant was the son of Young Quong Yuen.

If the officials found that the alleged father or the applicant, or both, were not worthy of belief, they might have given little weight to the photograph alleged to have been taken just before the first application was made. At least, they expressly found it was not of sufficient weight to overcome the other adverse testimony.

In case there is a practice of bringing in Chinamen under a fraudulent claim of relationship, as the numerous cases rejected and the careful scrutiny of the claims would indicate, the determination of relationship from photographs as between members of the Chinese race is not an entirely safe guide on which to rely. If the board found that the testimony of these witnesses could not be relied on, the photograph proves no more than at some time Young Quong On, alias Quong On, accompanied Young Quong Yuen, alias, Quong Yuen, to Hong Kong, where they had their photograph taken together.

The decree of the District Court is affirmed.

MORTON, Circuit Judge (dissenting).

The immigration records show that at least eight witnesses, some of them unrelated to the applicant, in thirteen different cases, over a period of twenty-three years, have referred by name to the present applicant as the son of his alleged father. The immigration authorities referred freely to past records and other cases, in which neither the applicant nor his alleged father was a party or had any interest, to find contradictions and inconsistencies. As far as appears, they gave no consideration to the weighty support of his case, which their search disclosed. The matter of the photograph, which is accepted as genuine by the immigration authorities, showed clearly that the applicant, a farm laborer, is of dull and uncertain memory. The immigration tribunals found that it (the photograph) "may be taken as indicating that there is some relationship between them, but it is not proof that they are father and son."

It was in that situation that the evidence to which I have referred was rejected as unworthy of belief. I do not agree that the proceedings of the immigration tribunals accorded that fair-minded and reasonable consideration of his claim to which everybody, even a Chinese laborer, is entitled, when he invokes our law, especially when that claim involves citizenship.