**YEP SUEY NING et al. v. BERKSHIRE, District Director of Immigration.**
**No. 7423.**

Circuit Court of Appeals, Ninth Circuit.
Nov. 15, 1934.

746

Geo. W. Fenimore, of Los Angeles, Cal., and Stephen M. White, of San Francisco, Cal., for appellants.

Peirson M. Hall, U. S. Atty., and M. G. Gallaher and Howell Purdue, Asst. U. S. Attys., all of Los Angeles, Cal., for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

SAWTELLE, Circuit Judge.

Claiming to be grandsons of Yep Nom, a native American citizen, Yep Wing Ock, 13, Yep Wing Shuey, 9, and Yep Suey Ning, 6, all three natives of China, on July 28, 1933, arrived at San Pedro, Cal., and applied for admission to the United States as citizens, under the provisions of 8 USCA § 6.

Yep Wing Ock and Yep Wing Shuey alleged that they were full brothers, and the sons of Yep Gim Nuey, who died in the Unit-

ed States in 1928. Yep Suey Ning claimed to be the son of Yep Gai On.

The American citizenship of Yep Gim Nuey and of Yep Gai On, the alleged fathers in this case, is conceded. The two men were brothers, the sons of Yep Nom, a native American citizen who is now residing in China.

Section 6, supra, provides that, under certain conditions, not pertinent here "all children born out of the limits and jurisdiction of the United States, whose fathers may be at the time of their birth citizens of the United States, are declared to be citizens of the United States."

All three boys were excluded from admission by a board of special inquiry of the immigration service, held at San Pedro, on the ground that they are not the sons of the alleged fathers. On appeal, the Secretary of Labor, through her board of review, affirmed the excluding decision as to Yep Wing Ock and Yep Suey Ning, the appellants herein, but, as to Yep Wing Shuey, reversed the board of special inquiry and permitted entry.

Habeas corpus proceedings were instituted on behalf of the appellants. From orders of the court below discharging the writs, the present appeal is being prosecuted.

The relationship of each appellant to his alleged father is the only issue in the case. In support of his position that the relationship has not been established, the appellee relies upon a number of discrepancies between the testimony of the appellants and that of their supporting witnesses.

It is settled law that such discrepancies may be urged for such a purpose. In Ex parte Wong Foo Gwong, 50 F.(2d) 360, 362, this court said:

"The immigration officials must necessarily base their decisions upon conflicts or agreements that arise in the testimony of applicants for admission and that of their witnesses."

It is equally well settled that the burden of proving the claimed relationship is on the appellants. Hoo Gan Tze v. Haff (C. C. A. 9) 67 F.(2d) 234, 236.

Finally, it is fundamental that, unless the lack of a fair hearing or the abuse of discretion is shown, the findings of immigration boards on the question of citizenship are final. In Quon Quon Poy v. Johnson, 273 U. S. 352, 358, 47 S. Ct. 346, 348, 71 L. Ed. 680, the court said:

"It is clear, however, in the light of the previous decisions of this Court, that when the petitioner, who had never resided in the United States, presented himself at its border for admission, the mere fact that he claimed to be a citizen did not entitle him under the Constitution to a judicial hearing; and that unless it appeared that the Departmental officers to whom Congress had entrusted the decision of his claim, had denied him an opportunity to establish his citizenship, at a fair hearing, or acted in some unlawful or improper way or abused their discretion, their finding upon the question of citizenship, was conclusive and not subject to review, and it was the duty of the court to dismiss the writ of habeas corpus without proceeding further. [Many cases cited.]"

Guided by these basic principles of immigration law, we advance to an examination of the discrepancies, for the purpose of determining whether or not they were of such a nature that the two boards, in basing their excluding decisions thereon, denied the applicants "a fair hearing" or "abused their discretion."

Yep Wing Ock previously applied for admission to the United States on September 24, 1931, at which time he was 11 years old. He was excluded on the ground that he had failed to establish that he was the son of his alleged citizen father, Yep Gim Nucy. The record in that first hearing is before this court in the instant case, and is relied upon by both sides in support of their respective contentions.

At the 1931 hearing, in San Francisco, Yep Wing Ock testified that there was one outside window in each of the two bedrooms in his home, in his native village of Tung San, Sun Ning District, China. Yep Gai On, his uncle and chief supporting witness, declared that there were two such windows in each bedroom.

Yep Wing Ock said that there were no rice fields on either side of his village. Yep Gai On testified that there were rice fields "at the head or tail" of the village; and Yee Ngip Wo, one of the applicant's witnesses, who, in an affidavit, described himself as a cousin of Yep Gim Nucy, Yep Wing Ock's alleged father, asserted that there was a rice field in front of Tung San, "only about a quarter of a city block away," and that "there is also a rice field at the head and tail of the village." Since Yee Ngip Wo stated that he had seen Yep Wing Ock "outside the village," while "passing by," it is inconceivable that an 11 year old boy would have missed seeing the rice fields surrounding the settlement as he loitered in the outskirts.

Again, Yep Wing Ock said that there was no embankment around the fish-pond in front of the village. Yep Gai On testified that "the south rim of the fish-pond is an embankment about four feet high, made of dirt," and that such embankment is "the only wall in or around" the village.

The applicant asserted that there are no bamboo or other small trees on the top of a levee that he had said lies *between* the fish-pond and the village. Yep Gain stated that there were such trees.

In this connection, it should be observed that, though Yep Wing Ock positively declared in one part of his testimony that there was no embankment around the fish-pond, he nevertheless stated that there was a "levee" in front of the village, "between the houses and the fish-pond." Since the village faces south, the alleged levee, according to Yep Wing Ock, would be north of the pond. Yet his alleged uncle placed the embankment at the *south* rim of the pool. Thus, even if we interpret Yep Wing Ock's statement most favorably, as meaning that, despite his other testimony, there *was* an embankment at the fish-pond, he and his alleged uncle cannot agree as to its location.

Yep Wing Ock testified that there was no candy store in Hong Mee village, near Tung San. Yep Gai On stated that the only store in that village was a candy store. This is one detail that we should expect a small boy to notice.

The applicant said that he did not know where his paternal grandmother was buried, and that he had "never been there." On this subject, Yep Gai On testified in some detail:

"Q. Did Yep Wing Ock ever visit his paternal grandmother's grave with you? A. Yes.

"Q. How many times? A. Once during my last visit, and it took place the third month of this year.

"Q. Did any one else accompany you besides him to that grave at that time? A. My father, the two younger brothers of the applicant, and my two youngest sons. That is all."

This discrepancy is significant, when one remembers the importance that the Chinese attach to reverence for ancestors. This reverence has been judicially recognized. In Flynn v. Tillinghast (C. C. A. 1) 63 F.(2d) 729, 731, the court said:

"Ancestor worship is a well-known and deep-rooted custom in China, and the young-er generations hold in reverence their for-bears, especially after their decease. One would have a right, therefore, to expect some degree of accord in the family testimony as to the date and place of death of the parents and grandparents, and their place of burial."

In the instant case, the applicant did not only fail to state the location of his grand-mother's grave, but denied ever having visit-ed the place of burial, though his alleged uncle testified that he had taken the boy there that very year! The discrepant testi-mony on each side as to this matter is clean-cut and unequivocal, and there seems very lit-tle likelihood of an error in interpreting, so strongly insisted upon in this case by counsel for the appellants.

Yep Wing Ock said that he attended the same school for four years, commencing at the age of 7 and continuing up to the end of the year before he testified. There was only one teacher at that school. The ap-plicant did not know his name.

The appellant asserted that he last saw his alleged father, Yep Gim Nuey, "over ten years ago," when "I was 12 years old." He later changed his answer to "two years ago," "when I was ten years old." This would make the year that he last saw his father either 1921 or 1929. Neither answer accords with the record. Yep Gim Nuey's file and Yep Gai On's testimony show that Yep Gim Nuey was last in China in 1924, and that he died in Grand Forks, N. D., on July 7, 1928.

Yep Wing Ock declared that the house in which he had been living with his family in the home village was separated by a space of about three feet from the next house, or the first house in the sixth row. The appli-cant's house was said to be the second house in the sixth row from the head of the village. Yep Gai On, however, testified that the fam-ily home was so close to the first house in the row, that they touched. Yep Sok Soon, an alleged cousin of Yep Wing Ock, declared that the two houses "actually touched one an-other." Yep Hoy Seem, another alleged cou-sin, and Yee Ngip Wo, the alleged second cousin, also stated that the two houses touch.

Yep Wing Ock first testified that there were no cross alleys in his village, but that there was a space between each house in each row. He later said, however, that there was a space of about four feet between his house and that of the neighbor just referred to, and that there were three cross alleys in the village—one between the first and second houses, one between the second and third houses, and one between the third and fourth houses of each row.

Yep Gai On and his two sons, however, as-serted that there is only one cross alley in the village—between the second and third houses of each row.

Turning again to the house adjoining Yep Wing Ock's alleged family home in Tung San, we find that the applicant testified that the family next door consisted of Yep Ot Gong and his wife, who occupied the east side of the house, and Yep Chun Ong and his wife, who lived in the west half; that the two men were not related, and were both about 30 years old; that Yep Chun Ong had no children; and that it "seemed" to the applicant that Yep Chun Ong's wife had died. This last statement is particularly cryptic, in view of the fact that, a few mo-ments before, Yep Wing Ock had declared that "Yep Chun Ong and his wife occupied the west half of that house"! The applicant also stated that he had never heard of a girl in the village named Yep Yin.

The testimony of the applicant's alleged kinsmen on the subject of these next-door neighbors differed sharply from that of Yep Wing Ock. Yep Gai On declared that the house in question was occupied by Yep Ot Hung, who was between 50 and 60 years old; that the other occupants of the house were Yep Ot Hung's wife and their 10 year old daughter, Yep Yin; that the couple had had one son, Yep Chun Ong, who was dead; and that Yep Ot Hung was abroad when Yep Gai On was last in China. In this connec-tion, it is to be noted that Yep Gai On ac-companied Yep Wing Ock to this country, so that both individuals presumably had had op-portunity of observing neighborhood facts at the same time. Yep Gai On said that the widow of the deceased son of Yep Ot Hung also lived in the same house, but that she "made a lot of trips back to her own native village and was in and out of that house when I was last in China."

Yep Sok Soon and Yep Hoy Seem, the al-leged cousins of Yep Wing Ock, corroborated their father's testimony that the family next door was that of Yep Ot Hung, and that there was a girl named Yep Yin who was a member of the family. Yep Hoy Seem's tes-timony agreed with that of Yep Gai On, to the effect that Yep Yin was the daughter of Yep Ot Hung, but Yep Sok Soon was not sure whether she was the daughter of Yep Ot Hung or of his son, Yep Chun Ong.

Commenting upon Yep Wing Ock's manner of testifying at this first hearing, the chairman of the board of special inquiry stated that the applicant had given his testimony "with considerable hesitation at times." An appellate court, of course, is deprived of the opportunity of observing a witness' attitude while testifying.

After his hearing in San Francisco, Yep Wing Ock was ordered deported by the board of special inquiry, and his appeal was dismissed by the Secretary of Labor. On December 24, 1931, however, the applicant's deportation was stayed, and the immigration service at San Francisco was ordered to reopen the case for the examination of the witness Yee Gnip Wo (or Woo), the alleged second cousin of the applicant, to whose testimony, dealing with the rice fields, we have already adverted.

Yep Gnip Wo's testimony was taken at Duluth, Minn., where the witness resided, on January 27, 1932. He stated that he and Yep Gai On, the applicant's alleged uncle, were partners in the laundry business at Duluth.

Yee Gnip Wo made several statements that were discrepant with those of Yep Wing Ock. The former said that he had made only one trip back to China, his native land, and had returned therefrom on May 8, 1928. He further stated that he had seen Yep Wing Ock at Tung San village, "quite a few years ago, * * * about five years ago," but that he could not remember the year and month.

Yep Wing Ock, however, testified that he had seen Yee Gnip Wo six or seven times "during the past year"—at Bo Hing Market, near Tung San, at the applicant's home, and "just outside" of the applicant's village.

After hearing this additional testimony, the board of special inquiry once again ordered Yep Wing Ock deported, the applicant once again appealed, and his appeal was once again dismissed, on March 7, 1932. He was deported to China four days later.

After Yep Wing Ock had again applied for admission, at San Pedro, on July 28, 1933, he was given another hearing before a board of special inquiry, on August 7, 1933.

When the name of Yep Wing Fong was first mentioned to the applicant, he twice said, "I don't know any one by that name." Later he stated that Yep Wing Fong was his brother, and explained his previous replies by saying that he had not heard the name when he was questioned about his alleged brother. Commenting upon this part of the applicant's testimony, the chairman of the board said:

"The Interpreter stated that he propounded to the applicant [the question] as to whether his alleged brother, Yep Wing Fong, was still in applicant's home in China, and on my oath as Chairman of this Board I aver that I heard the Interpreter clearly propound the question and enunciate the name 'Yep Wing Fong.' The only conclusion to be drawn from the applicant's answer to the question, in my opinion, is that he has no such brother and therefore did not immediately grasp the significance of the name."

At this third hearing, Yep Wing Ock was asked whether all of his statements made during his examination in San Francisco in 1931 were true and correct, to the best of his knowledge and belief, and he replied in the affirmative. He was also asked whether he had any additions or corrections to make with respect to his former testimony, and he said that he had not.

Apparently realizing that their testimony at the 1931 hearing, as to a cross alley and as to the spaces between the houses in the village, was contradictory, Yep Gai On, the applicant's alleged uncle, announced that he and his alleged sons wanted "to correct some of the disagreements in our testimony at that time." The uncle further testified that "there was a misunderstanding as to what a cross alley was, there is a small space between my house and the house in the front of ours, that space is an air space and not an alley way"; that the space was about one-half inch; that the same space separates the first and second houses of the rest of the six rows in his village; and that there is a cross alley about 54 inches wide running across the village between the second and third houses of each row.

Yep Sok Soon, one of the alleged cousins of the applicant, said that he had been mistaken in his testimony in 1931, and that there was a space between his house and the house in front of it; that the roofs touched, but there was a space between the walls, about one-quarter of an inch wide.

Yep Hoy Seem, the other alleged cousin, took the stand again at this third hearing, but gave no further testimony regarding the space between the houses.

Yep Gai On admitted that since he and his alleged sons had testified in 1931, they had compared their statements and had seen where they were in disagreement, and now desired to "testify in complete agreement."

From the foregoing, it will be seen that the applicant Yep Wing Ock has been given three separate hearings before boards of inquiry, and that at those hearings numerous noteworthy discrepancies developed. After a careful study of all these records, we cannot say that the board of inquiry and the board of review denied the applicant a "fair hearing," or, in excluding him from the United States, "acted in some unlawful or improper way, or abused their discretion."

We turn next to the appeal of Yep Suey Ning. This boy was born on February 17, 1927. He was given a hearing by the board of special inquiry at San Pedro on August 7, 1933, when he was almost exactly 6½ years of age. The board's order of rejection was based "on the evidence adduced in the companion hearing * * * of Yep Wing Ock and Yep Wing Shuey, alleged cousins of this applicant, the transcript of which is hereby made part of this record." In the Yep Wing Ock record, the board outlines a number of discrepancies that were developed at the hearings of the three applicants. The board's summary refers to other files in the archives of the immigration service, to substantiate its charge that discrepancies exist. This may be seen from the paragraph of the summary outlining the principal discrepancy in Yep Suey's Ning's testimony, that dealing with the residence of his paternal grandfather:

"All prior records of this family establish that Yep Nom, paternal grandfather of these three applicants, has always owned the first (or front) house in the 7th row, counting from the east or head of Tung San Village (see Exs. 'A' and 'B' and 'C' in S. F. file 23918/8–13), and that he has resided there with his second wife, Yee Shee, since his return to China in 1926. The present witnesses, Yep Gai On and his alleged two older sons, reaffirm that alleged fact, and the present applicant, Yep Wing Shuey (p. 10) further substantiates it, adding that his paternal grandfather Yep Nom and his present wife and child have never lived in applicant's house. The applicant Yep Suey Ning avers (pp. 3, 4 & 5) that his paternal grandfather Yep Nom lives with a younger woman and her young son in the same house in which the three applicants lived with their mothers—that their house is a long house—that his uncle Gim Nuey's family lives on the small-door side of the house, and that his (Yep Suey Ning's) family live in the other side of the house, and that his grandfather and the woman and little boy live in the same house with them; that the house has two kitchens, applicant's family using one kitchen and Wing Ock and Wing Shuey's family the other, the grandfather and the woman and her little boy eating in the same kitchen with his (Yep Suey Ning's) family. In answer to the question, 'Did they (paternal grandfather and the woman and her little boy who live with his paternal grandfather) ever live in any other house in your village that you know of?' Yep Suey Ning replied in the negative."

We have carefully compared the foregoing summary of the discrepant testimony, and, finding that it is accurate, we adopt it as our own. Furthermore, it is observable that Yep Suey Ning was closely and repeatedly questioned as to this matter, and he persisted in his version of the family domicile. The chances of surprise, entrapment, or an error in interpreting are so remote as to be negligible. Yep Suey Ning not only insisted that his grandfather, his mother, his brothers, and his cousins all live in the same "long house," but he went into minute detail as to what kitchen in the same house each branch of the family used, as to the occupancy of the one parlor, as to the rooms in which the cousins played when it rained, etc.

It is also to be noted that this flood of detail was loosed by the applicant after the chairman of the board had carefully cautioned him to test his recollection:

"Q. Let us see if you are sure about it— does your grandfather live with your mother and brothers, or does he live with your Uncle Gim Nuey's family? A. We all live in the same house—it is a long house."

The form of the question was not at all calculated to suggest the answer given. The chairman asked the boy to say *which* branch of the family lived with the grandfather, and the witness' answer was that both branches of the family did so. And this answer was in line with the testimony that Yep Suey Ning had already repeatedly given. There can be no mistake as to what the lad meant.

The details that form the basis of this discrepancy are of so simple and intimate a nature as to be within the comprehension of any normal child in his seventh year. It is inconceivable that a boy of that age, fresh from his home in China, would not know who lived in the same house with him and ate their meals with him. We could not say that the board had abused its discretion in excluding the boy, even if it had done so solely because of this discrepancy.

Yep Suey Ning appealed from the excluding order of the board of special inquiry, to the board of review of the Department of Labor. The decision of the latter board follows in part:

"We have carefully reread the record and find not only no indication of unfairness in the applicant's examination but also no indication of lack of painstaking and sympathetic questioning appropriate in the case of a little child applicant.

"Excluding other disagreements and adverse features which could and should be considered as weighing against the applicant's claim if he were older, the dismissal of his appeal was made to rest upon two outstanding discrepancies as to whether the applicant's paternal grandfather's family lives in the same house with the applicant or in another house and whether a child claimed by the applicant to be a member of his household is a baby less than two years old or a lad taller and older than the applicant who for some time has been attending school."

Counsel for the appellant, however, earnestly insist that the board of special inquiry, unlike the board of review, believed the testimony of Yep Suey Ning on the subject of the child that the applicant claimed was a member of his household. The record shows that, as to this matter, the board of special inquiry said:

"Now, since the applicant and all witnesses averred in the Yep Wing Ock case at San Francisco in October, 1931, that the grandfather Yep Nom had married a young woman, Yee Shee, after the death of his first wife, Wong Shee, in CR 14–11th month, and his return to China in December, 1926, and that no children had been born to his second wife up to that time, October, 1931, it would appear that their present claim that their father—grandfather, Yep Nom, has a son born in CR 20–10 (Nov. 1931) is a pure fabrication. It is more reasonable to assume that this child-applicant, Yep Suey Ning, but six years of age, in his childish frankness and innocence, is telling the truth about the 'little boy' who lives with his grandfather and is known to him as the son of the woman who lives with his grandfather. The conclusion to be drawn from this is, in my opinion, that Yep Nom married a woman who already had this child, who is now a little older and larger than the applicant Suey Ning. Of course, there is ample evidence in the testimony of Yep Suey Ning to justify the belief that he has been carefully instructed or coached as to family history and affairs, formation of his home village and other details. The same is evident in the testimony of the nine-year old Yep Wing Shuey."

We think that the board of special inquiry erred in believing the testimony of Yep Suey Ning as to the child in his grandfather's house. In our opinion, the board of review was correct in considering this discrepancy as weighing against the applicant's claim that he is the son of Yep Gai On, whose American citizenship is conceded. In view of the overwhelming testimony the other way, the conclusion seems almost inevitable that, as to this matter, Yep Suey Ning has not stated the facts.

In any event, we cannot say that the board of review abused its discretion in regarding the foregoing discrepancy as significant, in addition to the discrepancy regarding the place of residence of the paternal grandfather. As to this latter discrepancy, both boards seem to be in agreement that it is a material one; and, in this respect, again, we cannot hold that they have abused their discretion or denied the applicant a fair hearing or have acted in some unlawful or improper way. It is well settled, of course, that the fairness of the hearings before both boards is open to review by this court.

It must be borne in mind that this court must not substitute its judgment for that of the immigration boards on matters of fact. In Louie Lung Gooey v. Nagle (C. C. A.) 49 F.(2d) 1016, 1017, we said:

"We cannot too often repeat that, in immigration cases of this character brought before us for review, the question is not whether we, with the same facts before us originally, might have found differently from the Board; rather is it a question of determining simply whether or not the hearing was conducted with due regard to those rights of the applicant that are embraced in the phrase 'due process of law.' Tang Tun v. Edsell, 223 U. S. 673, 32 S. Ct. 359, 363, 56 L. Ed. 606. Even if we were firmly convinced that the Board's decision was wrong, if it were shown that they had not acted arbitrarily, but had reached their conclusions after a fair consideration of all the facts presented, we should have no recourse. 'The denial of a fair hearing cannot be established by proving that the decision was wrong.'"

See, also, Chin Ching v. Nagle (C. C. A. 9) 51 F.(2d) 64; Weedin v. Yee Wing Soon (C. C. A. 9) 48 F.(2d) 36, 37; Chin Wing v. Nagle (C. C. A. 9) 55 F.(2d) 609, 611; Weedin v. Chin Share Jung (C. C. A. 9) 62 F.(2d) 569, 570.

Nor is there an undue hardship being visited upon these two boys by the orders for their deportation to their native land. Their own testimony shows that their mothers and most of their other relatives reside in China.

The appellants received fair hearings before both the board of special inquiry and the board of review.

Accordingly, the orders of the court below, discharging the writs of habeas corpus and remanding the prisoners to custody for deportation, are affirmed.