## Ex parte STEWART.

### No. 2341–Y.

District Court, S. D. California, Central Division.

Oct. 6, 1942.

See, also, 47·F.Supp. 410.

A. L. Wirin and Fred Okrand, both of Los Angeles, Cal., for petitioner.

Leo V. Silverstein, U. S. Atty., and Howard V. Calverley, Asst. U. S. Atty., both of Los Angeles, Cal., for the Government.

YANKWICH, District Judge (after stating the facts as above).

Our legal system abhors finality. Because it does not assume the correctness of the judgment of any tribunal, it provides means, directly or indirectly, for questioning it. For this reason, I took jurisdiction of this case.

In determining it on the merits, it is well to bear in mind the scope of our review on habeas corpus. The controlling legal provisions are the administrative sections of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix § 310. Subdivision (a) reads: "The President is authorized * * * to prescribe the necessary rules and regulations to carry out the provisions of this Act." Under (2) he is authorized "to create and establish a Selective Service System, and shall provide for the classification of registrants

and of persons who volunteer for induction under this Act on the basis of availability for training and service," and so forth. After providing for the establishment of the Board and of the regulations under which they shall act, the section says: "Such local boards, under rules and regulations prescribed by the President, shall have power within their respective jurisdictions to hear and determine, subject to the right of appeal to the appeal boards herein authorized, all questions or claims with respect to inclusion for, or exemption or deferment from, training and service under this Act of all individuals within the jurisdiction of such local boards. The decisions of such local boards shall be final except where an appeal is authorized in accordance with such rules and regulations as the President may prescribe."

■■ In interpreting this enactment, all the judges of this Court have held that when the time for appeal has elapsed, or an appeal has been instituted and denied, finality attaches to the action of the Board; and that after a person, classified in 1–A, has been ordered to report for induction fails to appear, and wilfully disobeys the order of the Board and is prosecuted, he cannot in such prosecution offer testimony to show that he was not properly classified.

■■ However, because the statute uses the word "knowingly" (50 U.S.C.A.Appendix § 311), which implies wilful knowledge and a specific intent, we have allowed defendants in Selective Service cases to give their reasons for failure to obey, as going to intent.

The question, then, which gave us all thought was: What is the method for reviewing the action of the Board, after statutory finality? Is there no way for the Court, in pursuing its ideal of due process, to determine whether arbitrariness exists?

■■ In the opinion on the motion to dismiss, I answered the question by ruling that the writ of habeas corpus might be resorted to in order to institute such an inquiry.

The opinion is the law of the case. I adhere to it. Under Congressional authority, the writ lies whenever a person is restrained of his liberty under color of the authority of the United States. 28 U.S.C.A., §§ 452, 453.

■■ In interpreting these sections, in the light of Article I, Section 9, Clause 2 of the Constitution, the Supreme Court in McNally v. Hill, 1934, 293 U.S. 131, 136, 55 S.Ct. 24, 26, 79 L.Ed. 238, Mr. Justice Stone says:

"The statute does not define the term habeas corpus. To ascertain its meaning and the appropriate use of the writ in the federal courts, recourse must be had to the common law, from which the term was drawn, and to the decisions of this Court interpreting and applying the common-law principles which define its use when authorized by the statute. * * *

"The purpose of the proceeding defined by the statute was to inquire into the legality of the detention, and the only judicial relief authorized was the discharge of the prisoner or his admission to bail, and that only if his detention were found to be unlawful. In this, the statute conformed to the traditional form of the writ, which put in issue only the disposition of the custody of the prisoner according to law".

While the writ was denied, the Court, to my mind, gave the most elaborate definition of the scope of the writ.

In a case which arose during the last war, Arbitman v. Woodside, 4 Cir., 1919, 258 F. 441, 442, the Trial Court had discharged a writ of habeas corpus. On appeal, the Circuit Court said: "The rule is established that the action of such executive boards within the scope of their authority is final, and not subject to judicial review, when the investigation has been fair and the finding supported by substantial evidence; but upon proof that the investigation has not been fair, or that the board has abused its discretion by a finding contrary to all the substantial evidence, relief should be given by the courts under the writ of habeas corpus."

The Court gave there as its authority, the immigration cases, some lower court cases, which had arisen under the specific act, and Angelus v. Sullivan, 2 Cir., 1917, 246 F. 54, which I cited in my other opinion.

■■ The rule in immigration cases does not differ from the rule in other administrative cases. Except when a special method of review is provided, the findings of administrative bodies will be sustained when there is substantial evidence to support them, even when the facts are such that the judge who is reviewing the case under

the writ might reach a different conclusion. (See my opinion in United States v. Standard Oil Company of California, D.C.Cal. 1937, 20 F.Supp. 427, at pages 444 to 447, in which reference is made to many immigration cases and to leading articles and texts on the subject. The views there expressed were further amplified in the opinion on the trial on the merits, which appears in 21 F.Supp. 645. See especially pages 650 to 653.)

Our own Ninth Circuit Court of Appeals has laid down certain very definite principles in immigration cases. It is well to refer to them, because they place the proper limits within which the review must lie.

In Yep Suey Ning v. Berkshire, 9 Cir., 1934, 73 F.2d 745, 746, 751, Judge Sawtelle promulgated these principles: "Finally, it is fundamental that, unless the lack of a fair hearing or the abuse of discretion is shown, the findings of immigration boards on the question of citizenship are final. * * * 'We cannot too often repeat that, in immigration cases of this character brought before us for review, the question is not whether we, with the same facts before us originally, might have found differently from the Board; rather is it a question of determining simply whether or not the hearing was conducted with due regard to those rights of the applicant that are embraced in the phrase "due process of law." Tang Tun v. Edsell, 223 U.S. 673, 32 S.Ct. 359, 363, 56 L.Ed. 606. Even if we were firmly convinced that the Board's decision was wrong, if it were shown that they had not acted arbitrarily, but had reached their conclusions after a fair consideration of all the facts presented, we should have no recourse. "The denial of a fair hearing cannot be established by proving that the decision was wrong."'" See Taranto v. Haff, 9 Cir., 1937, 88 F.2d 85, 86.

So that the question before me is not, as counsel for the petitioner urge, whether I should promulgate a broad definition of what is a minister of religion. Nor is it whether, if I had been the board or the board of appeal, I would have, upon the showing made, reached the same conclusion.

The question is whether there is substantial evidence to sustain the finding of the board that this petitioner is not a minister of religion within the meaning of the law and the prescribed regulations which have the authority of law.

We are agreed now that, while the petitioner in this case charges violation of Opinion No. 14, Volume 3, of the Director of Selective Service, we cannot take cognizance of that objection, because the opinions of the Director have not the force of law. They are merely his expression of opinion directed to the various boards to guide them in solving certain particular problems.

Section 5(d) of the Selective Service Act of 1940, 50 U.S.C.A.Appendix § 305(d), reads: "Regular or duly ordained ministers of religion, and students who are preparing for the ministry in theological or divinity schools recognized as such for more than one year prior to the date of enactment of this Act, shall be exempt from training and service (but not from registration) under this Act."

Paragraph 360 of the Selective Service Regulations states:

"In Class IV–D shall be placed any registrant who is a regular or duly ordained minister of religion or who is a student preparing for the ministry in theological or divinity school recognized as such for more than one year prior to the date of enactment of the Selective Training and Service Act (September 16, 1940).

"b. A 'regular minister of religion' is a man who customarily preaches and teaches the principles of religion of a recognized church, religious sect, or religious organization of which he is a member, without having been formally ordained as a minister of religion; and who is recognized by such church, sect, or organization as a minister.

"c. A 'duly ordained minister of religion' is a man who has been ordained in accordance with the ceremonial ritual or discipline of a recognized church, religious sect, or religious organization, to teach and preach its doctrines and to administer its rites and ceremonies in public worship; and who customarily performs those duties."

We look at the facts here and we find that, in the original questionnaire, the petitioner sets forth his name, and under Series IV, "Occupation or Activity", he writes, "I am working at present." Under Question 1, he has put in the word "am" in the blank space left.

Under Question 2, he says, "The job I *am working at now* is Freight Traffic Management Clerk." (Emphasis added)

He is asked what he does in his present occupation, and he says: "I handle correspondence re freight charges, tracing shipments, etc. Do banking and adjustments of freight accounts."

To the question, "My average weekly earnings on this job are," he answers, "$40.00." So he must have been, as wages go, a skilled worker in his field of employment.

He gives as his employer, "G. A. Olson, traffic manager."

To the question, "Other business or work in which I am now engaged," he answers, "None."

To question 10, he answers, "I *am not* licensed in a trade or profession." (Emphasis added)

To question 11, he replies, "I am not at present an apprentice under a written or oral agreement with my employer."

Under Series V, "Other occupation experience", he states, "None."

Under "Dependency", he claims dependents, was married on July 30, 1932, at Duncan, Oklahoma; has no children. He lists the names of his wife, sister-in-law and nephew, as the persons who are living with him in a home which he occupies. His wife, evidently, was self-supporting, for he says she earned $1,320 during the preceding year. The sister-in-law also earned some money. He claims that his wife is financially unable to maintain her own home; that he has no property.

Under Series VIII, relating to ministers or students preparing for the ministry, he writes, "See appended sheet." In the appended sheet, he says: "I am an ordained minister of Jehovah God to preach the gospel of God's Kingdom under Christ Jesus and I am therefore one of Jehovah's witnesses." He gives the date of his ordination as February 5, 1939. Then he speaks of the classes which he attended, and argues that he is an ordained minister, not by reason of selection by any religious body, but through selection of God, Himself.

The Biblical bases for his contention are then given. There is no claim whatsoever in the original questionnaire, dated November, 1940, that he occupied any position in the "Company", either as a company servant or a back-call servant or a sound clerk. These claims appear later.

On December 13, 1940, the board classified him as a minister. Later, when his separation from his wife was brought to the attention of the board, it was also noted that he had been classified in 4-D by reason of his ministry, and that he had also signed a conscientious objector's blank, Form 47. There was an interview during which he repeated the previous statement that he was a minister in the sense in which he understood it.

Nowhere in the written document, which he submitted contemporaneously, was there any claim of any special work to distinguish him from all the other Jehovah's Witnesses, most of whom claim to be ministers.

In the letter of March 24, 1942, which he brought to the board, he claims ordination not by reason of employment as a back-call servant or anything else. He begins the letter: "On February 5, 1939, I made a consecration to do the will of Jehovah God and at that time received ordination from Jehovah, which is as the highest ordination, as recorded in the Bible at Isaiah 61:1, 2, as follows:" And then he quotes from the Bible: "Therefore I am an ordained minister of Jehovah God to preach the gospel of his Kingdom under Christ Jesus and am one of Jehovah's Witnesses. As one of Jehovah's witnesses, I am commanded to obey God by preaching the gospel as recorded in the Bible at Isaiah 43:9–12; Matthew 10:7, 12; Acts 20:20; 1 Peter 2:21 and 1 Corinthians 9:11. Since February 5, 1939, I have been actively engaged as a minister." Then he gives more Biblical quotations.

Now, this is a secondary matter. His primary claim as a minister is that he is an ordained minister of Jehovah God. He does not claim a higher position in the company. He says: "I also serve as a back-call servant of the Hollywood Company of Jehovah's Witnesses." And, from the description we have, this calls for clerical work. Then he goes on to say he supports himself. He adds: "I serve as area chairman in the Hollywood Company of Jehovah's witnesses. In this area it is my responsibility to coordinate the activity of twenty-five other Jehovah's witnesses, seeing that every home within the area is contacted and that the message of God's Kingdom is proclaimed to all who will hear." These positions, as he describes them, call for merely administrative work which even a novice, one who is not recognized as a minister, can do. The petitioner does not, at any time, maintain that this work is something which the others do not do, and which gives him a higher position than that of minister. He insists on the "ministry" as being the important thing.

A little later, we find the board making inquiry to discover whether his name appears on certain lists, which are recognized by the Selective Service as containing members who are entitled to classification as ministers—pioneers, and others. The board, on inquiry, is informed that his name is not there. An examination of the list, as presented, does not contain his name.

There is also presented to the board a group of statements, from various persons, that they consider him as a minister. But the fact is, however, that, under the tenets of the group, most of the other members are also ministers.

In answer to Question 4, "Are you now practicing ministry?" the petitioner's answer is, "No. I spread faith from door to door. I do not make my living this way, but it is my main interest." So there is a positive "No." And the remainder of the answer shows merely the basis for the claim. He is asked again whether he is a conscientious objector and he answers that he is not and expresses the desire to withdraw his previous claim for classification as such.

Now, the question before the Court is, "On the basis of this evidence was one conclusion only possible?" If that was the case, and that conclusion is that he was a minister of religion, then, of course, the board was wrong.

■ But, if from this evidence, if from the statements of the petitioner before the board, if from a scrutiny of his claim of conscientious objection, along with that of minister, if from his admission that he was engaged in a secular occupation and that his ministry was merely an incidental occupation to which he only gave a few hours a week, the board was justified in concluding that ministry was not the chief occupation of his life to which he devoted most of his working hours, then I cannot substitute my judgment for theirs. It is possible that a man might have two occupations. A well-known member of the Los Angeles Bar is also a minister. He has appeared as an attorney in this court. On the religious page of each Saturday's Los Angeles Times, you may find the announcement of his sermons. But, when confronted with the fact of multiple occupations, the board is called upon to determine whether a person devotes his lifetime to the ministry, so as to entitle him to a special classification, they have a right to weigh a registrant's claim of secular activity against his claim of religious activity, and to determine, in the light of the evidence before them, whether a man who supports his wife and relatives, who earns good wages, as wages go, and who nowhere claims the ministry as an occupation, is entitled to be classified as such.

Nowhere does the petitioner say: "I am also a minister of the gospel". He shows continuous employment at secular occupations back to 1932, when he left high school. He does not automatically place himself in the position of a minister by claiming a mystic ordination to which he devotes, according to his own maximum estimate, fifty hours a month.

I do not think that the fact that he may be a back-call servant, or a company servant even, adds to his stature. At least, he does not think so himself, because his chief concern is the validity of his spiritual ordination.

■ The present law relating to deferred classifications and exemptions by reason of religion is liberal. In determining whether a man is a minister of religion, of necessity, the Board must consider all the facts in each individual case. In dealing with an heterodox group, the board cannot follow the criterion which they use in other cases. They could not ask the petitioner for his ordination papers, because he had none. So they inquired whether he had had special training for this work. I see no disdain implied in the inquiry, "Have you pursued studies at a theological seminary?" The average person, familiar with the ordinary church groups, whether they be Catholic, Protestant or Jewish, assumes that one who is ordained as a minister and who practices the ministry must have pursued some special studies at some seminary or theological school to fit him for the profession. The petitioner answered this question in the negative. Then they inquired how he was ordained. So I do not see any evidence of prejudice in the inquiry. Rather do I see in it an honest attempt to arrive at a fair conclusion as to what is the proper classification.

I do not think that his answer that his ordination certificate cost a dollar—which he denies having made—was maliciously inserted for the purpose of humiliating the petitioner. The men who are members of the board are his neighbors. They are persons chosen from the particular neighborhood with the very object—as the President, himself, has emphasized—that the availability of a person to serve shall not

be determined according to fine-spun legal definitions of what is or is not a proper classification and what is or is not dependency. Rather that three neighbors, "the butcher, the baker and candlestick maker", in the light of certain general ideas, shall determine whether a claim for exemption is or is not valid.

I have tried to indicate what I conceive to be the function of the Court in this case. The facts, to my mind, are of such character that different conclusions could be drawn from them by different persons. And, that being the state of the record, it is not my province, in pursuit of an abstract ideal or of a perfect definition of ministry, to substitute my judgment for that of the Board.

If we consider the meager evidence on which the administrative decision in United States v. Standard Oil Company, D.C. Cal.1937, 21 F.Supp. 645, was based, if we consider the petitioner's claims and statements, such as the statement of his occupation, his work record over a long period of years, at full time, and his supplemental claim of being a Jehovah's Witness, his letter and claim of ordination through a spiritual process, and the later claim of special work, and the Board's own reactions to the sincerity of his claim of devotion to the cause, the conclusion is inescapable that the board had the right to conclude that the petitioner was not, strictly speaking, a minister of religion, entitled to be exempt from service. See, Buttecali v. United States, 5 Cir., 1942, 130 F.2d 172.

I am, therefore, of the view that there was substantial evidence to sustain the classification.

The writ will be discharged and the petitioner will be remanded to the custody of the marshal.