Ex parte YOST.

UNITED STATES ex rel. RUSSELL v. LAWRENCE, Commanding Officer of the Infantry Replacement Training Center, Camp Roberts, Cal.

Civil Action No. 3558–H.

District Court, S. D. California, Central Division.

June 6, 1944.

A. L. Wirin and J. B. Teitz, both of Los Angeles, Cal., for petitioner and relator.

Charles H. Carr, U. S. Atty., and James M. Carter, Asst. U. S. Atty., both of Los Angeles, Cal., for respondent.

YANKWICH, District Judge (after stating the facts as above).

Two questions call for decision. The first is whether the process of induction was completed and the petitioner is in the Army. The second is whether, assuming that he is in the Army, the failure of Local Board No. 1, Coos County, Oregon, located at Marshfield, to classify him as a minister was an arbitrary and capricious act unsupported by substantial evidence.

In determining both issues, it is well to advert to certain general principles. The right to wage war is co-existent with the right of sovereignty. The war powers of the United States are plenary. They include the right to do anything that the Congress thinks necessary. Two statements, which are eighty-one years apart, show how consistent the Supreme Court has been in upholding the war powers. The first statement is in the case of Miller v. United States, 1870, 11 Wall. 268, 305, 20 L. Ed. 135:

"Upon the exercise of these powers no restrictions are imposed. Of course the power to declare war involves the power to prosecute it by all means and in any manner in which war may be legitimately prosecuted."

The other decision is United States v. Macintosh, 1931, 283 U.S. 605, 51 S.Ct. 570, 574, 751 L.Ed. 1302. The Court said:

"The Constitution * * * declares that one of its purposes is to 'provide for the common defense.' In express terms Congress is empowered 'to declare War,' which necessarily connotes the plenary power to wage war with all the force necessary to make it effective, and to 'raise * * * armies' * * *, which necessarily connotes the like power to say who shall serve in them and in what way.

"From its very nature the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law."

And see Local Draft Board v. Connors, 9 Cir., 1941, 124 F.2d 388, 390.

The Congress of the United States, in this war, has been more tolerant towards the dissident than during the last war. During the last war only those persons were recognized as conscientious objectors who could show that they were affiliated with a group which taught opposition to war, such as the Quakers and Molokans, and such. 50 U.S.C.A.Appendix, § 204. Now all that a religious objector is required to show is that he is opposed to war by reason of religious conviction or that he is a minister. 50 U.S.C.A.Appendix, §§ 305(g), 305(d). [See, C. C. McCown, Conscience v. The State, 32 Cal.Law Rev., 1944, pp. 1–31]. And the person who makes such claim or seeks such classification may be granted a preference or total exemption. Congress has provided the means for asserting these claims before local boards. And a decision of a board is final, subject to appeal. 50 U.S.C.A.Appendix, §§ 310, 311.

To refer to the second problem first:

It is conceded that the basis for this review is the rule laid down by me in Ex parte Stewart, D.C.1942, 47 F.Supp. 415, 418. The problem of review, which counsel in the present case concede as a clear statement of the law, I there stated as follows:

"So that the question before me is not, as counsel for the petitioner urge, whether I should promulgate a broad definition of what is a minister of religion. Nor is it whether, if I had been the board or the board of appeal, I would have, upon the showing made, reached the same conclusion. The question is whether there is substantial evidence to sustain the finding of the board that this petitioner is not a minister of religion within the meaning of the law and the prescribed regulations which have the authority of law."

In the light of this, I have examined the entire record and I am convinced that it furnishes substantial grounds for the Board's denial of his classification. Several facts may be alluded to: The recency of his conversion and interest in the work of Jehovah's Witnesses, which is almost contemporaneous with, if not subsequent to, the enactment of the Selective Service Act of 1940; his immaturity; his lack of educational background; his claim to the occupation of a farmer for which in his questionnaire he gave the entire period of 1936 to 1943; his claim of conscientious objection (Form 47) which he filed within eight days after his Selective Service questionnaire in which he claimed classification as a minister, had been returned. These and other facts in the record to which allusion might be had, warranted the action of the Board. The fact that the Board saw inconsistency between a claim of ministry and the claim of conscientious objection, and that one member of the Board characterized it as perjury is not indicative of bias on the part of the Board. Whatever rationalization may be adduced to show consistency from the petitioner's point of view, from the standpoint of the average person who sits in judgment on matters of this character, there is inconsistency. Nor is the Board foreclosed by the fact that a certificate was presented to them signed by the Watch Tower Society and certifying that he was a pioneer. Such a certificate is no more binding on the Board than the ordinary printed certificate which is issued to members of Jehovah's Witnesses who are declared to be ministers regardless of whether they are pioneers, company servants, or the like. As to both of them, the right existed in the Board to go behind them. They had the right to consider the admitted fact in the certificate that his association with the group only dated to January, 1941. At the time he was not even a baptized believer. He was not baptized until April, 1941. They had the right to question whether, in the light of this, and other facts, he was, in truth, a pioneer or whether the Society, in its zeal to save one other member of its sect from

obedience to a law which they consider not binding, had issued a certificate which was, in fact, "for accommodation purposes".

Whether the files of the Board disclosed some intemperate language used by one or another of the members who passed on this classification, the undisputed facts are that he was given a full hearing and that the Board unanimously rejected the classification claimed, a ruling which the Board of Appeal, with equal unanimity, approved and which has now become final. This finality granted to the Board by the Congress in the exercise of its war powers I cannot disturb, absent substantial proof of arbitrariness. There is none in the record.

There remains, therefore, the first question propounded—whether the defendant is now legally under the jurisdiction of the Army. And if he is, the conclusion I have just reached places him beyond the jurisdiction of civil courts.

The solution of this problem involves the usual difficulty which comes to a Judge when the only guide before him is one decision of a high court—a decision of recent origin, which, consciously or unconsciously, one side seeks to extend and the other to restrict in its application.

The governing case here is Billings v. Truesdell, 64 S.Ct. 737. That case involved a refusal to take the oath, followed by refusal to submit to fingerprinting when ordered to do so. As I read the case, it must be interpreted as holding that the registrant must be guilty of a positive act of refusal or failure to complete the induction ceremony without which, as the regulations then stood, the induction is not complete. The following paragraphs from the opinion illustrate this interpretation:

"The examination of men at induction centers and their acceptance or rejection are parts of that process. Induction marks its end. But prior to that time a selectee is still subject to the Act and not yet a soldier. A case involving his rights or duties as a selectee prior to that event is a case arising under the Act. The civil authorities not the military are charged with the duties of enforcement at that stage of the process." 64 S.Ct. at page 741.

"The manner and method of effecting an induction into the Army are thus left for the War Department. But the power of the President under the Act 'to select and induct' men includes the power to determine when the selective process is completed. It is only after that process is finished that a selectee is eligible for induction." 64 S.Ct. at page 743.

"The Selective Service Regulations state that it is the 'duty' of a registrant who receives from his local board an order to report for induction 'to appear at the place where his induction will be accomplished', 'to obey the orders of the representatives of the armed forces while at the place where his induction will be accomplished', and 'to submit to induction'. § 633.21(b) Thus it is clear that a refusal to submit to induction is a violation of the Act rather than a military order. The offense is complete before induction and while the selectee retains his civilian status. That circumstance throws light on the meaning of the words 'actually inducted' as used in § 11 of the Act. Congress by accepting the Bone amendment to § 11 specified the maximum penalty to be imposed on those who violated the Act or disobeyed an order of their board prior to their induction. It also withheld from military courts jurisdiction over those offenders. At the same time Congress did not authorize the Army to search out delinquents wherever they might be and induct them without more. We must therefore assume that Congress as a matter of policy decided that those who disobeyed the order of their board and refused to be inducted were to be punished by the civil authorities and by them alone." 64 S.Ct. page 745.

"These considerations together indicate to us that a selectee becomes 'actually inducted' within the meaning of § 11 of the Act when in obedience to the order of his board and after the Army has found him acceptable for service he undergoes whatever ceremony or requirements of admission the War Department has prescribed." 64 S.Ct. page 746.

We have selected these paragraphs from the three parts of the opinion. They serve to emphasize the point that before military authority can be exercised over a registrant, the full process of induction must be completed. This is made very emphatic by Mr. Justice Frankfurter in his concurrent opinion:

"In the Falbo case we held the other day that 'The connected series of steps into the national service which begins with registration with the local board does not end until the registrant is accepted

by the army * * *.' [Falbo v. United States], 320 U.S. 549, 553, 64 S.Ct. 346, 348. The line that was thus drawn—when 'the connected series of steps' has ended— seems to me to be the line to draw between the civil and military status of a registrant. In other words, when acceptance of a registrant is communicated by the Army, the Army has made its choice. The man is then in the Army." 64 S.Ct. at page 747.

Characteristically enough,' the Court in its opinion points to the fact that both persons who fail to report for induction (citing Bowles v. United States, 1943, 319 U.S. 33, 63 S.Ct. 912, 87 L.Ed. 1194), and persons who, having reported, refuse to be examined (citing United States v. Collura, 2 Cir., 1943, 139 F.2d 345), could be prosecuted in civil courts. But the decision goes further and holds that one who does not complete the process of induction is also subject to prosecution in civil courts. United States v. Collura, supra, has this characteristic language:

"Obviously the duty to report for induction means more than putting in an appearance at the induction station." United States v. Collura, 2 Cir., 1943, 139 F.2d 345.

Obviously, one who, although apparently complying with the formality of induction, actually does not participate in it, and makes such non-participation known at the time, has not accepted the process of induction. I have adverted to the fact that repeatedly throughout the opinion "refuse" and "refusal" are used. But the word is not used in a restrictive sense. It is not to be confined to the positive act of refusal which the court was considering in the Billings case. Words, even in a decision of the United States Supreme Court, when not used in a special technical sense, should be given their ordinary meaning. Webster's Unabridged Dictionary, Last Edition, defines the word "refuse":

"2. To decline to accept; to reject; specif., to decline to have as wife or (now almost exclusively) as husband.

"The cunning workman never doth refuse The meanest tool that he may chance to use.

"3. To decline to submit to or undergo; to decline to do, give or grant; to deny. * * *"

So that refusal implies not only the positive act of rejecting a thing, but the negative act of failing to do a thing, which is tantamount to rejection.

■ The only elaborate narration of what took place at the induction comes from the petitioner himself. And if this were a case of one who, without notice to anyone, merely refrained from going through the formality of raising his hand and taking the oath, the claim could be easily rejected. And it should be rejected unhesitatingly under such circumstances. For it would enable persons, in the light of subsequent events, to nullify their acts of volition by claiming a failure to comply with certain outward requirements—a failure not communicated to any of those in authority. But this is not the case here. To begin with, the stipulation filed in this case purporting to summarize the testimony of Lieutenant Keith Leigh, who conducted the induction on December 8, 1943, is negative. It merely states that no unusual incident, such as failure to take the oath, was observed by him at the time. But characteristically, the stipulation also contains this statement:

"Lieutenant Leigh stated that at that time when prospective inductees refused to take the oath, they were inducted nevertheless if found to be otherwise qualified."

The petitioner, on the stand, stated that he told at least four persons, officers and non-commissioned persons about the induction center, before the induction ceremony, that he did not intend to take the oath and to at least one other after the ceremony was concluded, that he had not done so. The statement he gave at Camp Roberts to an agent of the Federal Bureau of Investigation on April 19, 1944, corroborates this fact:

"On December 7, 1943, I reported to my Draft Board at Marshfield, Oregon. It was in the evening. The whole group including myself then were taken by train to Portland, Oregon, arriving there on the morning of December 8, 1943. In Portland, we were taken to the induction station where I was given a physical examination in the morning. After this examination I signed a paper which I believe stated that I have passed the physical examination. After the physical examination, I told some officers, whose names I do not know but who was asking if I wanted to enter the Army, Navy or Marine Corps, that I did not want anything to do with any of them. He said it didn't matter that I was going anyway.

"After lunch, the whole group numbering about 75, including selectees from other draft boards and myself, reported to a room where a short talk was given us by an army officer who explained about being AWOL and the proper conduct of a soldier. During the talk he told us that we would report at Fort Lewis, Washington but that it would be in about 3 weeks and that we should contact our own draft boards for the exact time. After this talk the officer told everyone to raise his right hand and repeat the oath after him line by line. I was in the last row. I did not raise my right hand and I did not repeat the oath or any part of it.

"After the oath was given, we went to another room where our names were called out and we were each given a piece of paper telling us to report at Ft. Lewis, Washington. We all, including myself, initialed a paper on the table. I do not know what was on this paper. I then told the man who was either an officer or an enlisted man in the Army that I was not going to report and was not going into the Army. He told me to shut up and get out of the way, that I was going anyway and that I had passed the physical examination and was in the Army. During the time I was at the induction station, I told one officer and a corporal or a sergeant and one or two others that I was not going to go into the Army and had not taken the oath.

"After this, I then returned to Marshfield, Oregon, on the train leaving Portland on the night of Dec. 8, 1943, and arriving at Marshfield on the morning of Dec. 9. On my return home, I continued my evangelistic work of Jehovah Witness. On December 28, 1943, I called my Local Draft Board to determine when I was supposed to report at Ft. Lewis. The Clerk told me on Dec. 29, 1943 I was to report. I told the Clerk that I was not going to report and that I had not taken the oath at the induction center. She told me that the draft board records reflected that I was already in the Army. She asked me where I could be reached and I told her through Post Office Box 1263, Myrtle Point, Oregon."

We find corroboration of the fact that he declined to take the oath in the statement of Lieutenant Leigh to the effect that refusal to take the oath was considered by them an idle act and that inductees who made such refusal were "inducted nevertheless". That is actually what Yost states to the FBI agent that the officers and non-commissioned officers to whom he told before induction that he did not intend to take the oath and those to whom he told after induction, that he had actually not taken the oath, told him. In effect, they said to him "Whether you take it or don't take it, you are in the army." They would not have told him that had he not informed them of his refusal to complete the induction. But there is corroboration elsewhere, much stronger because it is contemporaneous. In the files of the Board, under date of December 28, 1943, the Secretary of the Board gives the following report of a conversation with the petitioner:

"12–28–43

"Mr. Yost called from Coquille and stated that he does not intend to report to Fort Lewis. Says it would mean 'Eternal Death' if he should go to war. Will be available at his address in Myrtle Point. Claimed he has a covenant with his God and that the Consc. Ob. would not be the place for him either. He was told that he would be listed as a deserter and he said he 'probably would' *Claimed he did not take the oath.*"

So there is clear corroboration of the petitioner's statement that he refused to take the oath and so informed those about him both at Portland and at Marshfield at the time.

█ In the light of this, his mere failure to break rank or even his acceptance of a copy of Special Order 287, which contained his assignment to duty, cannot nullify his positive refusal and failure to complete the induction. Nor can any doubts, which I myself have expressed, at the ability of an immature youth to understand without any admitted previous instruction that his failure to complete his induction process would automatically keep him out of the army or to subject him to criminal penalties in civil courts only, overcome the fact that we have here not only the refusal but a contemporaneous expression of the intention to so refuse. And we need not inquire by what prescience this boy divined what learned judges throughout the country did not. At any rate, we do not have a case of a person who seeks to retroject himself into the past and, in order to receive the benefit of a recent decision, fit the facts of the past to the pattern of the decision. Here the pattern

774

was set long before the decision was announced.

It follows that the process of induction was not completed and that the defendant refused to complete it, as he had informed those to whom he had the right to speak, that he intended to do at the time.

Therefore, he is not under the jurisdiction of the army of the United States. Let a writ of habeas corpus for his immediate discharge be issued.