## UNITED STATES ex rel. KULICK v. KENNEDY, Warden.

### Civ. No. 1671.

District Court, D. Connecticut.

May 6, 1946.

Hayden C. Covington, of Brooklyn, N.Y. for plaintiff.

Adrian W. Maher, U. S. Atty., of Bridgeport, Conn., and Valentine J. Sacco, Asst. U. S. Atty., of Hartford, Conn., for defendant

HINCKS, District Judge.

The petitioner herein, after conviction in May, 1945, on a verdict of guilty in the United States District Court for the Southern District of New York, for an alleged violation of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq., was sentenced to serve a term of three and a half years under the custody of the Attorney General. From this judgment no appeal was taken. Being now confined under the authority of that judgment in the Federal Correctional Institution at Danbury in this District, he has addressed a petition for a writ of habeas corpus to this court. The writ issued as prayed and after due return by the warden named as the respondent therein the parties have been fully heard.

The petitioner asserts that contrary to the Constitution he was denied due process of law first by the Selective Service System in connection with his classification and thereafter by the court at the trial which resulted in his conviction; as a result of this claimed denial he contends that the judgment of the court on the authority of which he is now concededly detained was a nullity for lack of requisite jurisdiction, and hence open to collateral attack in this proceeding.

However, the petitioner failed to appeal from said judgment and since concededly all the rulings of the trial court of which petitioner now bitterly complains could have been raised by an appeal seasonably taken, the Government contends that the judgment of the New York court is subject neither to attack nor review here. Thus the first question for determination here is whether this court on the pending petition has the power and duty to consider and adjudge whether the judgment of convic-

tion, entered in a sister court, which on its face has all the attributes of a valid judgment is in truth a nullity since dependent upon some violation of the petitioner's constitutional rights.

Where, as here, the trial court had jurisdiction over the subject matter and over the defendant's person any claim of error appearing in its proceedings—even error involving the denial of a constitutional right—ordinarily can be raised only through the appellate process and a failure to appeal is an effective waiver of the claim. However, a writ of habeas corpus will issue on a petition alleging facts which show that the apparent waiver was induced by fraud, coercion or ignorance of legal rights and if after hearing such allegations are found sufficiently sustained, the apparent waiver will be treated as ineffectual. Walker v. Johnson, 312 U. S. 275, 61 S.Ct. 574, 85 L.Ed. 830; Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357; United States ex rel. McCann v. Adams, 320 U.S. 220, 64 S.Ct. 14, 88 L.Ed. 4. In such cases, as also on petitions alleging jurisdictional objections had not been correctly dealt with by a trial court, Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442, 83 L.Ed. 455, a court in habeas corpus proceedings will after examination afford protection to such rights as may be found infringed.

This, to be sure, is not a case like those just cited, in which an appeal was waived or frustrated because of lack of competent counsel. The petitioner here was represented on his trial by the same counsel who is now vigorously pressing this petition. I hold, however, that the failure to appeal from the judgment of conviction may not be taken as an effective waiver of a constitutional right because the state of the law at the time of the trial was such that not even competent counsel could then have foreseen the utility of an appeal.

This was so because the charge upon which the petitioner was indicted and convicted was not that of having willfully failed to report for induction pursuant to an order of his local board. If such had been the charge, under the doctrine of Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305, decided in January, 1944, the petitioner, on the theory that he had failed to comply with an administrative order, valid on its face, would not have been entitled to interpose as a defense the claimed invalidity of the administrative order and not until he had complied with the administrative order would he have been entitled to a review of its validity on habeas corpus proceedings. Here concededly the petitioner, physically at least, had reported for induction but after acceptance by the induction authorities had refused to submit to induction. Thus the case here fell within the scope of the rule of Estep v. United States and Smith v. United States, 66 S.Ct. 423. Under this opinion the petitioner who had reported but refused to submit to induction was entitled to defend on the ground that the Selective Service Agencies in classifying him as 1-A, had acted without any foundation of fact, or arbitrarily and capriciously.

At the time of the trial in May, 1945, the rule of United States v. Flakowicz, 146 F. 2d 874, a Second Circuit case in which the defendant there was also represented by petitioner's counsel here, appeared to be controlling and a writ of certiorari from that decision had already been denied. 325 U.S. 851, 65 S.Ct. 1086, 89 L.Ed. 1971. And, as was pointed out in Mr. Justice Frankfurter's concurring opinion in the Estep case, the right to interpose as a defense in a criminal action such as this a claimed denial of due process by the Selective Service Agencies had been overruled by the Courts of Appeal in seven other federal circuits with more than forty appellate judges concurring. To be sure, petitioner's counsel, who also represented Estep and Smith, had applied for a writ of certiorari to review the decision of the Circuit Court of Appeals for the Third Circuit reported in 150 F.2d 768. But it was not until October, 1945, that this writ was granted. Consequently, and especially in view of the earlier denial of certiorari in the Flakowicz case, while Kulick's right of appeal was still alive, his counsel, though still persisting in his prosecution of an appeal in the Estep case, had had scant ground to believe that an appeal in

the Second Circuit would serve any useful purpose whatever.

In this situation, I think the petitioner should not be penalized because his counsel failed to foresee that widely prevalent doctrine apparently firmly settled would be upset and hence failed to appeal in his behalf. I think him entitled now in these proceedings to a judicial ascertainment of his constitutional rights and appropriate relief from any invasion of those rights which may be found.

In this aspect the case here resembles Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442, 446, 83 L.Ed. 455. There the court pointed out that the rule of review only through the appellate process "is not so inflexible that it may not yield to exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." And it held that a state of existing "uncertainty and confusion with respect to the question whether" certain offenses were triable in the state or federal courts was an "exceptional circumstance" which warranted a relaxation of the rule of review only by appeal. 306 U.S. at page 27, 59 S.Ct. at page 446, 83 L.Ed. 455.

Here, I think, the reversal of doctrine accomplished by the Estep opinion was an "exceptional circumstance" which justified resort to remedies now available only on a writ of habeas corpus. Whether under that circumstance some violation of a constitutional right resulted can be determined only if I look behind the judgment. I therefore address myself to that task.

From the petitioner's file with the Selective Service system which in its entirety has been received into the record here, from the complete transcript of his trial in the New York court which has also been received in evidence here, and from the evidence originally received at the hearing here on the issues raised by the petition for the writ, I make the following findings of fact:

1. The petitioner was born June 17, 1923. After godly upbringing by parents who are members of the sect known as Jehovah's Witnesses and extensive religious training in his childhood under the direction of the Watch Tower Bible and Tract Society which is the legal corporation which underlies the membership of that sect, the petitioner decided in December, 1939, to devote his entire life to the Lord and His Witness. At that time, when aged 16, he was baptized and from that time has considered himself as an ordained minister of the sect, not by virtue of any ceremony, ritual, or official appointment as such—of which indeed there was no evidence—but by virtue of his self-dedication and his subsequent acts. He was then in his third year in high school. At the close of that school year he entered upon what he called "full time pioneer activity" for about four months. Under the practice of the sect, a "pioneer" was required to devote a minimum of 150 hours of service monthly to the religious work of the sect.

2. Thereafter, in October 1940, he returned to complete his high school course. At the same time for about a year he attended a private commercial school two evenings a week so he "could apply for a well-paid job". In August 1941, he sought and obtained full-time employment with R.C.A. Communications. This continued until July 3, 1942, requiring his attendance for five to six and a half days per week. To secure this employment he falsely represented (1) that he was two years older than his actual age and (2) that he had been employed for three years by three specified employers. There was, however, no evidence that these false representations were known to the local board at least until after the petitioner had been finally classified.

3. He registered with local board 254 on June 30, 1942. After the termination of his employment with R.C.A., just after his registration, so far as was shown by the evidence before the local board, he devoted 150 hours monthly to his ministerial work until his arrest.

4. On March 29, 1943, he was classified as 1-A but on April 28, 1943, was reclassified as IV-D. In August 1944, he was reclassified as 1-A. Beginning in August 1943 he had supported himself by serving as a professional model posing in U. S. Army uniform at a minimum compensa-

tion of $7.50 per hour. According to the petitioner's testimony given to the trial court, this employment, which continued to the time of his trial, averaged only two hours a week and he so informed the local board. However, a member of the draft board called by the government at the trial in the New York court testified that at a Board hearing accorded the petitioner on August 30, 1944, "We asked him, as I recall, how much time he gave to his ministerial duties and the time he gave and the time he spent in making his livelihood did not jibe, so we concluded that most of his time was spent working as a professional model and very little time given to his duties as a minister." The petitioner's testimony at this hearing of the board was not reduced to writing other than by a minute recorded on his questionnaire which reads: "When registrant appeared it was learned after interrogation that he was an artist model—and has been photographed in military uniform: when further question C. O. (sic) in military uniform his reply was evasive." No corroboration from his commercial employer or from any other source of the contention that the petitioner's employment as a model was restricted to an average of two hours weekly was offered to the draft board, and although in my view the fact is irrelevant for present purposes, it may be noted that no corroborative evidence on the point was offered to the trial court or to this court at his hearing on the writ. At his trial, he admitted that in November, 1944, he had told an investigating agent that from his employment as a model "at times he could earn $35 a week" but denied having said that he had earned such a weekly sum.

5. The petitioner on trial testified that he submitted to the board no affidavits which it refused to receive and that the board received all the evidence that he offered. Indeed at the hearing above referred to the Board received a two-page typed statement by the petitioner relating to his ministerial activities but no writing relating to his commercial activities was offered.

6. After his hearing on August 30, 1944, the petitioner's classification as 1-A was continued and he was duly ordered to report for induction. Thereafter on appeal the Board of Appeal considered his case on the basis of the entire file of the local board and unanimously classified him as 1-A. By written statement appended to his notice of appeal he reviewed the evidence in the file tending to support his contentions and added that he had told the local board "that occasionally I do secular work but that this work did not interfere with my pioneer duties and requirements. In this connection I showed the board that part of the regulations applying to Pioneers, which states that 'they spend all or *substantially* all of their time in dissemination of their beliefs.' The average time that I spend doing this secular work does not exceed 2 hours for the entire week."

7. Selective Service regulations supplement the bare text of Sec. 5(d) of the Act, 50 U.S.C.A.Appendix, § 305, by the following:

"(b) A 'regular minister of religion' is a man who customarily preaches and teaches the principles of religion of a recognized church, religious sect, or religious organization of which he is a member, without having been formally ordained as a minister of religion; and who is recognized by such church, sect, or organization as a minister.

"(c) A 'duly ordained minister of religion' is a man who has been ordained in accordance with the ceremonial ritual or discipline of a recognized church, religious sect, or religious organization, to teach and preach its doctrines and to administer its rites and ceremonies in public worship; and who customarily performs those duties."

8. By letter dated June 10, 1941, the Deputy Collector of the Selective Service system invited Hayden Covington, apparently in his capacity as Vice-President of Jehovah's Witnesses, to submit lists of several categories of persons associated with Jehovah's Witnesses. On June 12, 1941, the Selective Service system promulgated an "Opinion", Vol. 3, No. 14, in which it was stated "The unincorporated body of Jehovah's Witnesses are considered to constitute a recognized religious sect, and that the nature of their activities, the record

kept of them, and their work places them in a position where they may be recognized as having a standing in relation to the organization and the other members of Jehovah's Witnesses similar to that occupied by regular or duly ordained ministers of other religions." The opinion proceeded to recite that the names of those of the sect who (Par. 3) devote their full time and effort to the manufacture and production of books, pamphlets and supplies, etc. (elsewhere referred to as the "Bethel Family"), and also members known as "pioneers" who (Par. 4) *"spend all or a substantial part of their time"* in the "work of teaching the tenets of their religion and in the converting of others to their belief, and who enjoy the esteem of other Jehovah's Witnesses, are recorded in the executive offices of the Watch Tower Bible and Tract Society and that "members of this group have a standing in relationship to that organization and the other members of Jehovah's Witnesses" which brings them within the purview of Section 5(d) of the Selective Training and Service Act of 1940, and "they *may be classified in Class IV-D, providing their names appear on the certified official list of such persons transmitted to State Directors of Selective Service by National Headquarters of the Selective Service System."* (Italics supplied.)

9. On November 2, 1942, an amendment of Opinion No. 14 was promulgated which made no change in the instructions for the classification of members of the Bethel Family and pioneers except that it did add this sentence: "The status of members of the Bethel Family and pioneers whose names do not appear upon such certified official list shall be determined under the provisions of Paragraph 5 of this Opinion." Paragraph 5 of the amended opinion reads as follows: "The members of Jehovah's Witnesses, known by the various names of members of the Bethel Family, pioneers, regional servants, zone servants, company servants, sound servants, advertising servants, and back-call servants, *devote their time and efforts in varying degrees* to the dissemination of the tenets and beliefs of Jehovah's Witnesses. The deference paid to these individuals by other members of Jehovah's Witnesses also varies in a great degree. It is impossible to make a general determination with respect to these persons as to their relationship to Jehovah's Witnesses. Whether or not they stand in the same relationship as regular or duly ordained ministers in other religions must be determined in each individual case by the local board, based upon whether or not they devote their lives in the furtherance of the beliefs of Jehovah's Witnesses, *whether or not they perform functions which are normally performed by regular or duly ordained ministers of other religions,* and, finally, whether or not they are regarded by other Jehovah's Witnesses in the same manner in which *regular or duly ordained ministers of other religions are ordinarily regarded."* (Italics supplied.)

10. The name of the petitioner was at no time shown to have been included in the list of ordained ministers known either as the "Bethel Family" or as "pioneers" furnished National Headquarters of Selective Service System, although the petitioner personally and through the affidavits of associates had represented that he had been an ordained minister since 1939. Whether this list after November 2, 1942, was supplemented by subsequent additions to the membership of the Bethel Family and the pioneers does not appear in the evidence.

11. The Year Book of Jehovah's Witnesses for 1943, which was the only item of evidence originally received at the hearing on the pending writ, and which purports to cover a report for the fiscal year of 1942 and to have been copyrighted in that year, recites under the heading "Ordained": "These followers of the Lord, who have chosen to follow a course the same as He did when He was upon the earth, are ordained ministers of the gospel. A man doesn't represent God because some creature says he is God's representative. The only way anyone could determine who are ordained of God is to judge them by their works." And again, "There are many other ordained ministers of Jehovah's Witnesses whose names are not listed in this year's report, but those that are listed are specially equipped to look after their ministerial duties at the headquarters of

the Watch Tower Bible and Tract Society or its branches or as traveling evangelists." Then follows lists of the Bethel Family and of the Pioneers in neither of which appeared the petitioner's name.

12. Under date of February 4, 1943, the petitioner addressed to the local board a letter calling attention to the amendment to Opinion No. 14 referred to above. On April 3, 1943, having been recently notified of a 1-A classification, he wrote to request a personal hearing and appended to his letter a request as follows: "I request that you enter upon the classification record in the space provided the date you receive this request and also the date and time fixed for me to appear, and promptly mail to me notice of time and place fixed for my appearance, as provided in section XXVI, of the Selective Service Regulations."

13. On November 9, 1944, he was ordered to report for induction. He did so report and after being found acceptable for induction refused to submit to induction and his case was accordingly referred by the local board to the U. S. Attorney for criminal prosecution. On trial, he admitted to the court that when he reported he was resolved not to submit. He acted, so he testified, without legal advice and testified that he reported and submitted to examination "so that I could according to my own understanding of legal proceedings exhaust my civil remedies."

### Discussion and Conclusions

The Selective Service regulations, as quoted in the foregoing findings, define a "duly ordained minister of religion" as one "who has been ordained in accordance with the ceremonial ritual or discipline of a recognized church, religious sect, or religious organization." It is apparent from the literature of "Jehovah's Witnesses" which is in evidence and particularly its Year Book, that the sect does not have any ceremonial ritual of ordination or any prescribed course of discipline which is recognized as a prerequisite to a sectarian classification as an "ordained minister". Judging from the literature in evidence any member of the sect who mentally resolves to consecrate himself to the teach-

ing and preaching of its doctrines considers himself an ordained minister, and if his subsequent conduct is in harmony with that self-consecration he comes to be recognized by the individual members of the sect with whom he comes into contact as an ordained minister of the sect.

Certainly there is no evidence in the case that this petitioner was ever ordained in any ceremonial ritual, and although it does appear that prior to his claimed ordination at the age of 16 his Bible study was under the direction of members of the sect there is no evidence of any course of discipline of specified content prescribed as a prerequisite to ordination to which this petitioner conformed.

The administrative definition of a "regular minister of religion" is broader. However, the definition includes recognition by a recognized sect. The definition I think implies a recognition by the sect as an organization as distinguished from recognition by individual members of the sect. This conclusion is emphasized by the apparent absence of any prescribed qualifications for membership and of any authentic record of the roster of members. Here, to be sure, the petitioner submitted to his draft board affidavits of several persons representing themselves to be associated with the sect in various capacities but there is a complete absence of evidence to show that these affiants have any more authority to certify to the petitioner's status than he to theirs. Thus at most the petitioner's affirmative evidence of his ministerial status consists of nothing more than an accumulation of mutually self-serving declarations.

That the regulation contemplates official, organizational, as distinguished from individual, recognition is further suggested by the arrangement noted in the findings whereby the organization was invited to supply the Selective Service Headquarters with official lists, and by the fact that is apparent from its own publications that it did maintain such lists. But the petitioner here was not included in such lists,—at least so far as the evidence discloses.

The only evidence that I find which resembles official recognition is the photo-

stat of a certificate of the Watch Tower Bible and Tract Society, Incorporated, dated October 5, 1942, reciting that the petitioner was baptized in December 1939, devotes his entire time to missionary work, "has taken a course of study in the Bible and Bible helps prescribed by this Society, and has shown himself apt to preach and °teach" and that "he has the scriptural ordination to preach." The certificate continues: "He is therefore declared by this Society a duly ordained minister of the gospel." This certificate is signed by J. Sullivan (if I have deciphered the signature correctly) as "Superintendent of Evangelists." There is, however, no evidence in the record as to the powers and authority of Mr. Sullivan. I notice in the Year Book, which is in evidence, a report of the meetings of the Watch Tower Bible and Tract Society (a Pennsylvania corporation) and the Board of Directors of the Watch Tower Bible and Tract Society, Inc., a New York corporation, held for the election of a President to succeed J. F. Rutherford, deceased. The report announces the unanimous election of Nathan H. Knorr as President and Hayden C. Covington as Vice-President. The Year Book also records annual meeting of the Pennsylvania corporation on October 1st, 1942, at which a resolution was adopted wherein the members "duly assembled as legal representatives of our brethren throughout the world" declared (in part):

"(4) That for more than sixty years Jehovah has used faithful men, C. T. Russell and J. F. Rutherford, as his servants to fill the office of President, the chief executive office of the Society, to oversee the affairs of the earthly part of Jehovah's organization under direction from the Lord;

"(5) All faithful servants of the Lord have recognized that The Theocracy, of which the Watch Tower Bible and Tract Society is a servant, operates from the Top down, and not from the bottom up as in the worldly governments, and, therefore, that instructions come to the Lord's people on earth from the office of president of the Watch Tower Bible and Tract Society, filled by anointed men chosen of the Lord in his organization;

"(6) We recognize before the Lord that Brother N. H. Knorr is His chosen servant to fill the office of president vacated by the passing on of Brother J. F. Rutherford to a higher office and field of service in Jehovah's organization; and that with this change in personnel in office the organization has not changed one bit, but that it has continued forward with greater speed and increase than ever before known in the history of God's earthly organization."

Whatever powers Mr. Knorr or other corporate officers may have derived from this resolution or from other sources does not otherwise appear. Still less is there evidence in the record to show authority in Mr. Sullivan to certify the classification of an ordained minister or to show what the requirements for such a certificate may be. Cf. Ex parte Stewart, D.C., 47 F.Supp. 415.

I thus conclude that the action of the administrative agencies did not necessarily conflict with the regulations as properly construed.

■ However, the "opinion" of the Deputy Director noted in my findings may be taken as indicating an administrative practice which sanctions some relaxation of the regulations. Cf. Goodwin v. Rowe, D.C., 49 F.Supp. 703, and Ex parte Stewart, supra. And this opinion clearly contemplates the propriety of a IV-D classification in certain cases in which there is no legal evidence of official recognition by the sect. The opinion makes it plain that the board was to judge each such case on its individual merit and suggests tests so broad and vague that considerable room is left for the discretion of the board. However, since the practice thus sanctioned is by way of relaxation of lawful regulations, registrants who claim exemption are in no position to charge that an administrative discretion which can operate only in their favor is illegal for its vagueness.

■ Turning to the content of Paragraph 5 of the Opinion, quoted above in my findings, it will be noted that one of the tests suggested is whether or not such registrants "devote their lives in furtherance of the beliefs of Jehovah's Witnesses" and "whether or not they perform func-

tions which are normally performed by regular or duly ordained ministers of other religions." Since, under the opinion, members on the official list are deemed to come within the purview of the statutory exemption only if they "devote all or substantially all of their time" to the teachings of their sect, it is only reasonable to believe that this same requirement should be deemed incorporated in the test broadly stated in Paragraph 5, quoted just above, for alleged ministers not on the official list. The tests also fairly suggest that the continuity of full-time activity is an important factor. I quite agree with the holding in United States ex. rel. Hull v. Stalter, 7 Cir., 151 F.2d 633, that the classification should be made on the basis of the registrant's status at the time of classification. I think, however, that his status at that time may depend in part, at least, upon the continuity of his previous full-time service.

Looking then to the facts of this case, we see that the petitioner's Selective Service file showed that after the petitioner at the age of 16 years came to consider himself ordained as a minister his full-time service was interrupted first by a year's attendance at high school (and as it was later developed at the trial by part-time attendance at a night trade school). Thereafter his full-time ministry was again interrupted by full-time employment for the greater part of a year as an industrial worker. After this employment terminated, on his own representations he was classified as IV-D. He was not reclassified as 1-A until, as he himself admitted, he was currently employed as a commercial model.

■ His secular employment being thus admitted, its extent became a proper factor in the determination of his status. Ex parte Stewart, supra. He offered no corroboration whatever of his testimony that only a weekly average of two hours was spent in his commercial employment. Since in the administrative proceedings before the board the burden of proof was upon the registrant to sustain his claim of exemption under a IV-D classification, the absence of corroboration was significant. United States ex rel. Steinberg v. Graham,

D.C., 57 F.Supp. 938; Rase v. United States, 6 Cir., 129 F.2d 204; Harris v. Ross, 5 Cir., 146 F.2d 355; and United States v. Geesen, D.C., 59 F.Supp. 726. The evidence shows that his own testimony on the point though received and considered by the local board was not fully believed. Surely the petitioner's right to present evidence and have it considered does not include an ironclad right to have all his testimony believed. Here the board's recorded skepticism as to the petitioner's veracity was later confirmed by his admission at the trial that in order to obtain secular employment he had deliberately misstated his age. This is so even if, as his counsel offered at the trial to prove, the employment was sought to enable him to accumulate a fund for self-support during a coming period of ministerial activity. If he lied, as he admits, to obtain pecuniary means of support for his ministerial activity it is not unreasonable to infer that he might have lied to escape such interference with his ministry as would result from a 1-A classification.

■ All things considered, it cannot be said that the board acted without evidence. The Estep opinion does not suggest that a court may invalidate an administrative finding merely because on the same evidence it might have found otherwise; instead it expressly holds to the contrary.

Nor is there evidence of arbitrary or capricious administrative action. The fact that the board for so long continued the petitioner's IV-D classification is convincing demonstration that its members were not unduly prejudiced by his mere membership in the sect. Petitioner's counsel, however, contends that his conduct in posing in military uniform for commercial gain while enjoying exemption under a IV-D classification created a prejudice against him in the mind of the board.

■ The fact that the petitioner from such soft work enjoyed a higher rate of compensation than basic army pay might possibly have had a tendency to create prejudice. But an administrative determination having at least some support in the evidence may not properly be invalidated merely because of a possibility of prejudice resulting from the petitioner's own conduct. Other-

wise, in any case invidious or contemptuous conduct might in practical effect serve as a ground of exemption and thus thwart the urgent legislative objective. When, as noted above, there was conceded evidence of commercial as well as ministerial employment, the administrative action must be attributed to the state of the evidence, and not to a state of emotion not affirmatively shown to have existed. United States ex rel. Hull v. Stalter, 7 Cir., 151 F.2d 633.

It may be further noted, however, that at the petitioner's trial the court allowed a member of the local board to be cross-examined by petitioner's counsel as to the mental processes upon which the official determination was based. In so doing, the court went further, I should suppose, than the law required for the protection of the petitioner's rights. However that may be, the cross-examination, instead of disclosing prejudice, elicited testimony to just the opposite effect.

Other allegations in the petition have not been overlooked. It recites that after the petitioner was finally classified by the local board as 1-A, the board "refused to permit him to offer full evidence of his exemption and denied a fair hearing, thus abridging his procedural rights to make a complete record before the Board of Appeal." In view of his testimony at the time of the trial that the Board received all the evidence and testimony which he offered and the fact that his entire file was transmitted to the Board of Appeal, I can only treat this allegation as made out of extravagance. Certainly it has not been sustained.

■ The petitioner further alleges that the Board violated the Selective Service Regulations in that it "failed to make a full, adequate and complete record in writing of all the evidence offered at said hearing", in violation of Regulations 622, 623 and 627.13. This latter regulation, it is true, requires that, on notice of appeal, "if any facts considered by the Local Board do not appear in the written information in the file, the Local Board shall prepare and place in the file a written summary of such facts." However, this requirement plainly does not contemplate that the file in the case must be expanded by irrelevancies; all that is required is that the record shall be sufficiently complete to enable the Board of Appeal to perform its assigned function and make a classification on the basis of the record received from the local board. Regulation 627.24. If the Board of Appeal deems the file to be incomplete, provision is made for its correction. Reg. 627.23. Here, however, the Board of Appeal made no request for correction of the file: apparently it considered the file sufficient for the proper performance of its function.

■ It is true, as was stated in my findings, that the only written minute of the petitioner's testimony as to the extent of his employment as a commercial model was brief and indicated that the local board had found the defendant's answers "evasive". And it is also true that Reg. 627.13 states that "in preparing such a summary the local board should be careful to avoid the expression of any opinion *concerning information* in the registrant's file and should refrain from including any argument in support of its decision."

Having in mind that under the administrative system only the local board had opportunity to see and hear the witnesses and thus to form a first hand conclusion as to their veracity and that the Board of Appeal acts only on the written record, I do not construe the regulation just quoted as prohibiting the local board from indicating that it has questioned the veracity of the witness on a specified point.

■ Even if under a proper construction of the regulation it were felt that the local board had failed to fully comply with Reg. 627.13, the defect was at most technical and not of such substance as to infringe any constitutional right. Indeed, it appears to have been waived. For under Reg. 627.12 the registrant may attach to his notice of appeal "a statement specifying the respects in which he believes the local board has failed to consider or give sufficient weight, and may set out in full any information which was offered to the local board and which the local board failed or refused to include in the registrant's file." As my findings show, the petitioner here

availed himself of this right to the full extent desired but made no charge that the minutes of the local board were inadequate.

In this connection, it may be noted that this petitioner was neither dull nor ignorant of his legal rights. Scarcely a month after his statement of appeal had been filed he reported for induction, as he himself testified, in order to "exhaust my civil remedies." If he knew that submission to the board order was necessary for such a purpose it is fairly inferable that he knew enough to include in his statement of appeal any evidence which would have been favorable to him. Moreover, the note appended to his letter to the Board imported familiarity with the Regulations. (Finding 12.)

The foregoing conclusions, in my view, dispose of this case on the merits. But more is needed to dispose of all of the petitioner's contentions. For he argues that his constitutional rights were violated not only by the Selective Service agencies but by the trial court as well, and that unless he is given an opportunity to have a jury pass upon a defense which according to my ruling, though admissible in law, is without support in the facts, his remedy is incomplete.

 But as to this, the Sixth Amendment of course does not require submission to a jury of an issue of fact wholly unsupported by the evidence. At the petitioner's trial he testified that he had told the local board of his current commercial activity and his previous full-time commercial employment. Thus by his own concession the board had some evidence in support of its 1-A classification and it could not be said that its action was without evidence. A careful examination of the transcript discloses that all the evidence received and all the factual evidence (as distinguished from argument and conclusions) which the defendant at his trial had offered to prove, contained no basis for a finding that the local board had acted arbitrarily or illegally. That being so, no question as to the validity of the administrative action was left for submission to the jury. And the charge of the trial judge which excluded from the jury a consideration of the valid-

ity of the classification can perhaps be justified, without collision with the law as later announced by the Supreme Court, by the absence of evidence to support an attack on the validity of the classification. As Mr. Justice Douglas observed in the Estep case [66 S.Ct. 427], the provision of the act that the decisions of the local boards shall be *final* "means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant."

It is true that in the Estep and Smith cases the Supreme Court ordered new trials. But in so doing the court was acting under the appellate process upon appeals directly taken from the convictions complained of. In such a situation it was not the function of the appellate court of last resort to make an original determination as to the validity of the underlying administrative orders. It does not follow that in the pending habeas corpus proceedings sitting here at the base of the judicial pyramid I should assume to issue such a mandate to a sister court. Under the writ I have power only to release or remand.

Mr. Justice Holmes observed in Frank v. Mangum, 237 U.S. 309, 345, 35 S.Ct. 582, 595, 59 L.Ed. 969: "* * * habeas corpus cuts through all forms and goes to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings, and although every form may have been preserved, opens the inquiry whether they have been more than an empty shell."

 Having invoked the writ the petitioner cannot complain if I look behind the trial and examine the validity of the administrative action thus cutting "to the very tissue of the structure" of his grievance. This I have done and find that the

petitioner has failed to sustain the burden of proving the invalidity of the administrative action complained of. The burden of proof was on the petitioner. Johnson v. Zerbst, 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357; Estep v. United States, supra.

And if, as I hold, the administrative action was valid in law and in fact, the action of the trial court could not possibly have deprived the petitioner of a valid defense.

It is accordingly ordered that the writ be discharged and that the petitioner be remanded.